WRIGHT, J.,
delivered the opinion of the Court.
This is a contest among several creditors of the North American Coal and Transportation Company, as to which shall have priority of lien upon certain lands of this company, situated in the State of Tennessee, and chiefly, if not entirely, in White county.
The North American Coal and Transportation Company is a non-resident corporation, and Elijah H. Talmadge and Henry L. Stevenson are, severally, its creditors, and have filed bills against it as such in the Chancery Court at Sparta, and caused these lands to be attached. Samuel Newman is also a creditor of said corporation, and claims a lien upon said lands under and by virtue of four several mortgages, executed upon said lands by the said corporation to one Charlés Newman, of a date prior to said attachment bills. These mortgages, with the mortgage debts, were assigned by *339 said Charles to Samuel Newman, and, as such assignee, he brings his bill to have satisfaction of his debts out of said lands. It is not contended, and could not be, that he stands upon any higher ground than Charles Newman, his assignor. If the mortgages be invalid or void in the hands of the latter, they are necessarily so in his hands. They appear to have been executed in the State of New York, and there duly acknowledged, and registered in White county, Tennessee; all of which being done previous to the filing of the attachment bills, gives the mortgages the prior equity unless they be void. This, it is insisted they are, by Talmadge and Stevenson, upon the ground that said corporation had no authority to make them, and was, in fact, prohibited from so doing; and that, therefore, they created no lien whatever.
The solution of this question depends upon the power of this corporation under its charter. It was organized in the State of New York, under and by virtue of the general and public corporation laws thereof, and having its principal place of business in the city of New York; but by the terms of its charter, its operations might be carried on not only in the city and county of New York, but anywhere within the United States. Its certificate of incorporation, or document, showing who the original corporators were, the object and purposes of the corporation, and what were the statutes under and by virtue of which they were enabled to become, and did ^become a corporation, was filed in the county clerk’s office of the county of New York, on the 28th of April, 1855, and after-wards a duplicate thereof filed with the Secretary of State; and from thence they became and were a corporation by the-name and title of the North American Coal and Transportation Company, organized under two statutes — the first datedi February 17th, 1848, and the second dated June 7th, 1853.
The object of said corporation, as stated in the certificate, was to mine, or cause to be mined, and to purchase either anthracite or bituminous coal, or both; to sell, vend, or dispose of the same; to either lease or purchase, or both, coal and other mines, or mining lands, and such real and personal *340 property and equipments to transport coal and other freight, • hy canal or otherwise, as might he deemed by the trustees to he advantageous to the company. The act of the 7th of June, 1853, merely enables the company to pay for lands and other property in its stock instead of money. It provides that the trustees of the company may purchase mines, manufactories, and other property necessary for their business, and issue stock to t-he amount of the value thereof in payment therefor j and the stock so issued shall be declared and taken to be full stock, and not liable to any further calls; neither shall the holders thereof be liable to any further payments.
The act of the 17th February, 1848, is the chief charter of the company, giving it most of the powers, faculties, and capacities it possesses. The last clause of the second section of this act declares, “ They shall, by their corporate name, be capable of purchasing, holding, and conveying any real and personal estate whatever which may be necessary to enable said company to carry on their operations named in such certificate, but shall, not mortgage the same, or give any lien thereon.”
It is conceded, in the pleadings, that the title to the lands in controversy is in this corporation; and it is not denied but that they were acquired for the legitimate business purposes of the company under its charter, and there is nothing to show they were not,
The Chancellor held these mortgages valid. In this we think he erred. This corporation is expressly prohibited, in its charter, from giving any mortgage, or lien of any kind, upon its real or personal estate, and therefore wanted the capacity to make any such contracts. From the principles announced by the Supreme Court of the United States in the Bank of Augusta v. Earle, and the other cases reported in 13 Pet., 519, it will be seen that though a corporation may sue or be sued, or make contracts in other States, or in reference to property there situated, as well as in the State of its creation, yet it has no capacity for any of these things, unless enabled to do so by its charter, and certainly cannot *341 act wherein it is restrained or prohibited, any more than if it had never been incorporated. It is immaterial where it may have obtained its charter, or that the property with which it undertakes to deal may be within another jurisdiction. Whenever a corporation makes a contract, it is the contract of the legal entity, of the artificial being created by the charter, and not the contract of the individual members. The only rights it can claim, are the rights which are given to it in that character, and not the rights which belong to its members as citizens of a State. It is precisely what the incorporating act has made it, and derives all its powers from that act, and is capable of exerting its faculties only in the manner which that act authorizes. It may be safely assumed that a corporation can make no contracts, and do no acts either within or without the State which creates it, except such as are authorized by its charter; and those acts must also be done by the officers or agents, and in such manner as the charter authorizes.
We have no law or statute in our State relieving this corporation from the prohibition, or enabling it to mortgage its real estate situated here. It cannot even claim a legal existence, save in the recognition by our Courts of the charter granted to it by the State-of New York; and that charter is fatally destructive of these mortgages. Neither are we aware of any policy which requires that we should give them effect. It is as much the law of this State, and to the interest of its citizens, as of New York, that corporations shall be kept within their charters. To be sure, the incidental common law authority existing in most of the States, whereby corporations are enabled to execute mortgages to secure their debts, and to create preferences among their creditors, has not been repressed here, as in New York. But this difference does not, as we conceive, prevent us from extending to that State the' usual comity of recognizing its law. The cases of contracts made in a foreign country — to use the language of Judge Taney — are familiar examples. It is established as a principle of international jurisprudence, that effect should be given to the laws of another State, whenever the rights of a litigant *342 before our tribunals are derived from, or are dependent on those laws, and when such recognition is not prejudicial to our own interests, or the rights of our own citizens. Judge Story, in his Conflict of Laws, sec. 38, says:
“ In the absence of any positive rule, affirming, or denying, or restraining the operation of foreign laws, Courts of Justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interests.”
The foreign law, for the purpose of the decision of the particular case, becomes our law by our own voluntary adoption and consent. Not that the laws of a country have any binding force beyond its own territorial limit; or that the authority of a foreign law is admitted with us ex proprio vigore, but only ex comitate. And if prejudicial to ourselves, or our citizens — of which we must be the exclusive judges — we are under no obligation to give it effect. But in cases not so prejudicial, a spirit of comity, and a sense of mutual utility, ought to induce us to allow full force and effect to the foreign law. Story’s Con. Laws, sec. 98.
Undoubtedly, notwithstanding the New York prohibition, Tennessee might declare, as to real estate within her limits, that mortgages might be made and preferences given by this corporation. And if, by any law, or policy of our State, a failing or insolvent corporation were denied the power of making preferences among its creditors, it would be a question whether a foreign corporation, created in a State allowing such preferences, or where the charter gave the authority, should, as to property here, be allowed any such power, to the prejudice of our own citizens.
This corporation, as to the power claimed for it to execute these mortgages, stands upon a very different footing from a natural person. The former exists and acts, only by and through its charter. The power of alienation in the latter is not derived from any grant, but rests upon general principles of law, and of right. Many disabilities might be imposed by the laws of a foreign government, or State, upon its subjects *343 or citizens, which our Courts would deem purely local and incapable of being enforced here, when sought to be applied to transactions or property within our jurisdiction. Story’s Con. Laws, secs. 87, 91, 92. And it may be that the restriction in the charter of a foreign corporation might be of such a nature as to make it the duty of our Courts to disregard it, giving effect to the residue of the charter. But it is sufficient here to say that we do not deem the prohibition contained in this charter to be of that character.
That a corporation may lawfully be restrained in its charter from the execution of mortgages upon its property, there can be no doubt. In the case of The Commonwealth v. Erie and North East R. R. Co., 27 Penn. R., 355, the rule laid down by Judge Black, in delivering the opinion of the Court, is, that in a private deed, an exception as large as the grant is void, because private deeds are construed most strongly against the grantor. But a grant of privileges by the State, to a body of adventurers, must be construed precisely the other way — in favor of the public and against the grantees. A prohibition, reservation, or exception in a charter, must, therefore, stand in full force, though it destroy or make nugatory all the powers given to a company. That it may be so restrained, is also laid down in Angelí and Ames on Corporations, and numerous other authorities. Ang. and Ames, 153, 154, 155, (3d Ed.); Charles River Bridge v. Warren Bridge, et al., 11 Pet., 420, 544 to 553.
And those who purchase lands, or take mortgages of it, are bound, at their peril, to take notice of these restrictions. Ang. and Ames, 155.
But, it is said, conceding all this to be so, still, that inasmuch as Charles Newman originally conveyed these lands to this corporation — for which it never paid him — and the bonds secured in these mortgages being given for that purchase money, the implied lien given by law to the vendor may be enforced. To this there are two answers; first: Charles Newman having unconditionally conveyed the land, the lien is personal to him, and does not pass by the assignment of the *344 debt to Samuel Newman; and if the lien were not suspended by the assignment, Charles Newman is no party to this suit. Secondly: if this were not so, the conveyance having invested the corporation with the legal title, the lien cannot be set up against the creditors of the vendee. 2 Meigs’ Dig. 921, 922.
And there is still another answer. We are reasonably satisfied that the mortgage bonds are not for the original purchase money to Charles Newman; but that, on the contrary, this company was based upon these bonds, and issued stock to Charles Newman in payment for his interest in the same, under the act of the 7th of June, 1853; and that this stock, with other rights claimed by Charles Newman, were subsequently surrendered to the company, and the mortgage bonds and mortgages executed in consideration of the surrender.
The decree of the Chancellor will be reversed, and priority given the attaching creditors in the order of their levies.